Force v. Haines.

HENRY FORCE v. ELIZABETH HAINES.

In Error to Middlesex Common Pleas.

Action of *indebitatus assumpsit*, can never be maintained unless upon a contract expressly made between the parties, or implied in law.

No action will lie for a mere voluntary courtesy.

A master is not liable to a third person, for the support of his infirm and helpless slave, when he has not only not permitted, but has positively refused to do so. *Per* Ford, White and Dayton, Justices. Hornblower, C. J. and Nevius, J. dissenting.

*B. Williamson* and *S. Scudder*, for plaintiff.

*Armstrong*, for defendant.

FORD, J. Henry Force sold the custody and services of his adult slave Minna, unto Elizabeth Haines, by deed, to be holden from September, 1822, till June, 1826, when the slave was to be returned to him. Elizabeth Haines, at the expiration of the time, accordingly tendered the slave to Mr. Force, and on his refusal either to receive the said Minna, or be accountable for her maintenance, she maintained the slave about two years herself, and then turned her out of doors. After being absent about six months, Minna returned again to Mrs. Haines, who received and maintained her about seven years more; and then, in an action of assumpsit, in Middlesex Pleas, declared against said Force, 1. That in consideration she had furnished board,

clothing and necessaries for the slave of said Force, (not saying, at his request,) that he afterward promised to pay &c.    2. That being indebted to her in $2000, for board, clothing and necessaries furnished for his slave, at his request, in consideration thereof, he afterward promised to pay &c.    The defendant pleaded non assumpsit, and the statute of limitations.

At the trial, the plaintiff proved the tender of the slave, to Force, and his refusal to receive or be accountable for her maintenance ; that the plaintiff then maintained the slave, as before stated ; that she had a very bad temper ; that she had lost the sight of one eye, by intemperance, and was partially and sometimes wholly blind of the other ; that her services were of little or no value ; and that her maintenance was worth a dollar and a half a week.    There was no evidence of her being requested by Force, to maintain the slave, or that he ever promised to pay for it.

When the plaintiff had given all the evidence she had to offer, the court refused a motion, made by the defendant, for a non-suit, as appears by the bill of exceptions.    The defendant moved the court to charge the jury, that this action for the maintenance of his slave, could not be maintained against him, in law, unless they were satisfied, from the evidence, that the maintenance was furnished at his request, or that he subsequently promised to pay for it.    But the court refused so to charge the jury ; and thereupon they found a verdict for the plaintiff, and damages to the amount of $300.    The errors assigned are two in substance.— 1. That this action will not lie without proof that the maintenance was furnished at his request, or that he subsequently promised to pay for it.    2. That the court erred in not so charging the jury.

The action of *indebitatus assumpsit* being founded in its very nature on a contract, can never be maintained, unless a contract has been expressly made between the parties, or implied in law ; and as no express contract requesting the maintenance or promising to pay for it, is pretended in the face of notice that he would never pay it : the sole question is whether the law will imply a promise.

Now the great and leading rule of law is, to deem an act done for the benefit of another, without his request, as a voluntary

courtesy, for which, no action can be sustained. The world abounds with acts of this kind, done upon no request; but would more abound with ruinous litigation, and the overthrow of personal rights, and civil freedom, if the law was otherwise. A man who has nothing else to do, goes to mowing in his neighbor's meadow; or when his team lies idle, to plowing in his neighbor's field; or a carpenter out of employment, goes to mending his neighbor's sleigh, without the slightest request to do so; taking away from that neighbor, the common right to mow and plow for himself, when he is unable or unwilling to hire, and the right of doing without a sleigh, or of using it in the plight it was in, rather than incur the expense of repair; is it to be believed that they can maintain actions, and make that neighbor pay for such unrequested work, and with costs too, as Lord Mansfield said in a like case, "in spite of his teeth." No man's private business, in the mode or time of it, would be under his control, or free from the interference of strangers, perhaps idlers, drunkards, and perhaps enemies, under such pretences, drawing him from business into litigation. The rule of law, that an act done for the benefit of another, without his request, will not maintain an action, need be traced no farther back than the year, 1767, at which time it is stated in *Bul. N. P.* 147, thus:— "If a thing be done without my request, and for my benefit, when I was under no *moral* obligation to do it, and I *promise* to pay the money, the promise is *void*; but if I was under a *moral* obligation to do the thing, and *afterward promised* to pay the money, *that is good*." The same author in page 281, illustrates the rule thus: "As where a pauper was suddenly taken ill, and an apothecary is sent for" (without the knowledge of the overseer of the poor) "who attends and cures her, and after the cure, the overseer *promises* payment, this is good, for they are under a *moral* obligation to provide for the poor. Even a *moral* obligation on the defendant to do the act, will not render him liable without an *express promise* to pay." The case before Lord Mansfield, of *Stokes* v. *Lewis*, 1 Ter. Rep. 20, need not be stated at large; it was decided on the great point mentioned by Erskine, thus: "One of the first principles of law is, that an assumpsit cannot be raised by paying the debt of another, against his will." The case of *Jenkins* v. *Tucker*, 1 Hen. Bl. Rep. 90, establishes

the rule beyond controversy. In Tucker's absence, his wife was obliged to contract *debts* for necessaries in sickness, and at length died. Jenkins her father, after her death, paid those debts *for the husband* who was a wealthy West Indian; and they were debts which the husband was not only *morally* but *legally* bound to pay; but he did not request his father-in-law to do it, nor did he afterwards promise to pay him; and Lord Loughborough and the whole court held, that no action could be maintained for money paid without his request or subsequent promise. We may next look to our own Supreme Court, where this rule was established by the solemn opinion of all the judges in the case of *Potter* v. *Potter*, 1 *Pen. Rep.* 415, nearly forty years ago, in an action for maintaining the defendant's slave, without his request or any promise to pay for it. The court held without a dissenting voice, "That the plaintiff could not *take on himself* to maintain the slave, and then bring an action against the owner of the slave, for such maintenance." That decision has stood as the law in this state, for upwards of thirty years, and never been shaken; yet the owner was under both a moral and legal obligation to maintain his slave. The Supreme Court of the State of New York, came to the same conclusion, on common law principles, afterward, in the case of *Dunbar* v. *Williams*, 10 *Johns.* 249. An action was brought against Dunbar, for curing his slave of a venereal disease, without the owners request or subsequent promise; but the court held, that it being done without either, it *must* be deemed in law as being done gratuitously, and no action would lie for it. So afterward in *Everts* v. *Allen*, 12 *Johns.* 352, a physician sued the overseers of the poor, for his attendance on a pauper in an ordinary case, without any request or promise by them. PER CURIAM: "The overseers never have, in any way, sanctioned the plaintiff's demand, or promised to pay it, nor employed him to perform the service; there is therefore *no* obligation to pay, unless it be implied by law; and the law will create no such liability." The same court afterward held a previous request, or a subsequent promise to be necessary in one of the most pointed cases that can be imagined, that of *Bartholomew* v. *Jackson*, 20 *Johns.* 28; they held that no action would lie by law, for removing a stack of wheat standing in a stubble field, though the stubble was on fire and the flames rapidly approaching the stack,

without proof that the owner requested its removal, or that he subsequently promised to pay for it.

To this great and pervading rule of law, an exception has been established by an entire class of uniform decisions, that where a person lies under a moral and legal obligation to do an act, and another does it for him under such circumstances of urgent necessity, that humanity and decency admit of no time for delay, the law will *imply* a promise to pay, without proof of an actual promise. The oldest case of this class, though comparatively recent, has been so uniformly supported by subsequent decisions, as to form at this day an established exception ; but it is the farthest that courts of justice have ever gone, as some of them have declared. It was the case before cited in part, about half a century ago, of *Jenkins* v. *Tucker*. One Tucker, a wealthy West Indian, married the daughter of Jenkins, in England, where on her becoming ill, he left her and her infant child ; and not sending her remittances adequate to her necessity in sickness, she had to contract some debts for necessaries, and finally died in his absence. Jenkins, her father having, after her decease, paid *those debts*, and also the *expenses of her funeral ;*— and Tucker not agreeing to make him any re-imbursement, the father-in-law sued him. The cause was tried at Nisi Prius, before Lord Loughborough, C. J., and afterwards argued very ably at bar ; when the Chief Justice said, ". It was not my intention that *any of the debts*, contracted by the defendant's wife, which the plaintiff discharged after her death, should have gone to the jury. But I think there was a sufficient consideration to support this action for the *funeral expenses*, without any *request* or *assent ;* for the plaintiff acted in discharge of a duty which *common decency required at his hands.* 1 *Hen. Bl. R.* 90. A *moral* and *legal* obligation laid on the husband to pay debts contracted by his wife for necessaries, just as much as to pay the funeral expenses, and the plaintiff would have recovered the former as certainly as the latter, if mere *moral* and *legal* obligation had been a sufficient ground for the law to imply a promise ; but the court made this important distinction, that the debts were connected with no such urgent necessity or humanity as required their payment without the assent or request of the defendant, and therefore the law would *not imply* a promise as to them ; but a dead

body tending immediately to putrefaction, was incapable of waiting for either request or assent; the funeral became a matter of urgent necessity for common decency, not able to wait for either request or assent, as far as the debts are concerned, this case shews the general rule in its full strength, and as far as the funeral expenses are concerned, it shews the exception in its full strength; but the exception has never been carried any further. The same exception was adopted by Lord Kenyon, seven years afterwards in the case of *Searman* v. *Castell*, 1 *Esp. N. Pr.* 270, in an action against a master, for medicine and attendance in his own house, without request or promise, on a *sick servant* (not a servant in husbandry, but of the kind which the master was bound to provide for in sickness and in health.) Lord Kenyon said, " That a master was *bound* to provide for his servant in sickness and in health, and therefore was liable for medicines furnished to his servant while in his employment—not that his servant was at liberty *to go abroad* and contract *debts* for medicines; but that while he was *under his master's roof,* the master was under a *legal,* as well as a *moral* obligation to provide for the necessary medicines, and to pay for them, *under such circumstances."* The circumstances mentioned were, a servant not able to go abroad, confined by sudden illness probably, under his master's roof; forming an urgent case that could not wait, on the principles of humanity; the servant might die before the master could be found and his assent be obtained. Lord Kenyon never meant that a physician might hunt for patients in any family where he could learn there was a sick person, and intrude himself there into practice; but in an urgent case, any physician might go when called on, though not by the master. Sickness must prove fatal to every man living, sooner or later; and its mortality, till the last moment, being contingent, it always gives alarm to the sufferer and either awakens sympathy in the beholders, or exposes them for want of it, in that high court, revealed to us, of *dernier resort,* whose judgment will be, " I was *sick* and ye visited me not." A broken bone, a contused body, a burning fever, acute inflammation, or spasms, ask no permission of the common law, or any of its forms, to fall upon mortals. The law knowing this to be so, makes humane provisions for such cases, most of which come under the denomination of *cas-*

ual poor ; forming by far the most numerous class of cases where-
in this exception has been allowed to prevail ; consisting of per-
sons falling sick out of the parishes to which they properly be-
long. Five years after the case of the *sick servant*, another
came before Lord Eldon at Nisi Prius, of *Simmons* v. *Wilmot*, 3
*Esp. N. P.* 91. One Shaw, in the parish of Islington where he
had no settlement, was flung from a cart, and so badly bruised,
he could not be removed to his own parish ; he was carried into
a house near by, of Simmons, who nursed him till his recovery,
without any previous request or assent of the overseers of the
poor, against whom, he brought an action for nursing and at-
tendance. Lord Eldon said, "the question is, whether Sim-
mons, in point of law, has a demand against the parish officers,
from the duty imposed on them, by law, to take care of *casual*
poor. It comes to this point ; was the person relieved, within the
description of *casual* poor ? If he was, the parish officers were
bound to take care of him, and he who does take care of him has
a right to recover against them." A person influenced by hu-
manity may provide instant relief for an indigent, helpless crea-
ture overtaken by casualty and misfortune, without waiting for
any request; for instead of calling in, the nearest surgeon or
physician, if he first go to hunting up an overseer, to give the
order, death may interpose. Hence it is, that an act done with-
out request, in favor of *casual poor*, is an exception out of the
general rule ; and it forms a class of cases the most numerous in
law, where the exception has been allowed. They may all be
arranged, in fact, under the great head of *urgent necessity* ; such
as sickness, casualty, and burial of the dead. The case of *At-
kins* v. *Banwell*, 2 *East*, 305, did not come within the exception.
A pauper of B. being taken in A. too ill to be removed, was pro-
vided with medicine and assistance by the overseers of A, who
afterward sued the overseers of B for reimbursement ; but could
not recover, because the overseers of B, were not bound to main-
tain their poor, in another township ; the obligation lay on the
overseers of A,.to maintain him as *casual* poor, and it could not
be shifted off, on to another parish. The next in order of time,
was the great case of *Dunbar* v. *Williams*, 10 *Johns.* 249, which
contains a review of all the foregoing cases, together with that
of *Wennal* v. *Adney*, 3 *Bos. & Pull.* 247, to the same effect ; and

is unquestionably more fully and ably considered by the court, than any other case, English or American, on the subject. It firmly adheres to the general rule that an action will not lie for an act done for the benefit of another, without his previous request or subsequent promise to pay for it; and that the only exception arises out of the concurrence of two facts; first, a legal and moral obligation on the defendant to do the act; and second, that it was done for him, under circumstances not admitting of time for obtaining permission, such as cases *in extremis*, casualty and necessity. It is much to be regretted that a contrary case to this well settled doctrine, should have happened lately in the same court, going to subvert the general rule and the exception also; anomalous in its nature, founded on no case, nor reducible to any principle. It is that of *Forsyth* v. *Gansel's Admr.* 5 *Wend.* 558. The father of John and James Gansel, having in old age married a second wife, he and his wife conveyed all his property to John and James, giving to John $1000 the most, in consideration of which, he agreed to support his father and step-mother, during their lives; but when his father died, he refused to support her any longer; whereupon Forsyth the plaintiff, her own son maintained her several years, without the request of John, or his promise to pay for it; for which maintenance, he brought an action in his own name against the administrator of John Gansel, and the court sustained the action, without any evidence that the step-mother was a pauper, or sick, or of any emergency. The court admit her legal right, against John Gansel, under that private agreement, to a support; and yet they allow Forsyth, an utter stranger, and no party to that contract, to give it in evidence, and recover upon it in his own name. Now how could another action for the same thing, *in her name*, be repelled? Not for want of a good cause of action, for the court admit her right under a private contract, to support; not by a former recovery, for the record is between other parties; not that she assented to Forsyth's recovery, for he sued in his own name; not by a fraud, for it was the act of the court. She could force the administrator to pay the money over again, unless the court resorted to another anomaly. The court decided the case, on its analogy, they say, to necessaries for a married woman, and her infant child; and as no married woman can sue her hus-

band, it puts the step-mother and her step-son on the footing of husband and wife. There is no other way to make out an analogy. The case stands in full opposition and hostility to that of Dunbar v. Williams, so that if one is law, the other cannot be so. It rests upon no case. It discloses no principle. It supposes an analogy, where none can exist without a supposition of incest. The oldest case, founded on a review of all prior decisions, is that of Dunbar v. Williams, and having adopted their principles, and being in harmony with all the books, is not to be overthrown, in my humble opinion, by this anomalous case, and especially in this state, where the law has been settled to the contrary, ever since the case of *Potter* v. *Potter*, *Pen. Rep.* 415. Both the rule and the exception have stood without a shade of variance, from 1767 to the late period of 1833, according to decisions abridged in 2 *Har. Dig.* 1655, undisturbed except by that case of Forsyth v. Gansel; and in my opinion, they must govern the case before us.

The situation of Elizabeth Haines cannot be relieved without upholding this action for maintenance of a slave against the owner's will; without his request or any promise to pay for it, and in a case of no emergency; which would legalize interference with the private business of others, in a manner subversive of law, and mischievous to society. She ought not to have harbored the slave; but if actuated by pity towards an old servant, should have notified the overseer of the poor, who would have found a ready mode of compelling the owner to do his duty. The court erred also in not charging the law explicitly to the jury, as they were requested to do, and on both grounds, the judgment ought to be *reversed*.

WHITE, J. concurred.

DAYTON, J. Elizabeth Haines who was plaintiff below, bought of Force, the services of a black girl, named Minna, for ten years. The black girl being the slave of Force, it was agreed that at the expiration of that time, she should be returned to him, by Mrs. Haines. And it appears by the evidence, that she was tendered to Force, according to the contract, but that he refused to receive her. That in a subsequent conversation, she, Mrs.

Haines, complained to Force, of his conduct in not receiving back the black girl, when he answered that "he never would receive her unless obligated to by law, and that if the plaintiff recovered any thing of him, (meaning for the support of the black girl,) he would put his property out of his hands." This conversation was at least six years before the commencement of this suit, and yet the plaintiff below continued to support the black girl, and without any evidence of an express request or promise to pay on the part of Force, she recovered on the trial, for her maintenance for six years next preceding the commencement of the suit. These are all the facts which are important to be known, to lead us to a decision in this case.

Among other errors assigned for reversal, one is, that the court below refused to nonsuit. Another, that the court refused to charge the jury, that unless the plaintiff had proved to their satisfaction, that she had supported the black woman at the defendant's request or under his direction, she could not recover.

Other errors are assigned, and other points were made on the argument, but nothing which in my judgment affects the case.

I. Minna being the slave of Force, he was morally and legally bound to support her; knowing as he did, her destitute condition. Does this raise an implied assumpsit in favor of Mrs. Haines? And here let it be remembered, that there is nothing which gives to Mrs. Haines, any peculiar rights in this case, other than would have been common to any other citizen, who, from motives of benevolence or otherwise, had supported the black woman as Mrs. Haines did. And if we sanction the recovery in this case, we must adopt the general principle and extend a right of recovery under like circumstances, to all such as shall take upon themselves to give support to another's slave, when it may be needed.

This will be to supersede all necessity of application to the overseers of the poor, and constitute every man the keeper, at his option, of this class of the poor of his neighborhood: nay indeed of all classes and cases where the statute creates a legal liability on one man or set of men, to maintain another, if they neglect their duty; for the implied assumpsit, it must be remembered, springs if at all, *not from the moral,* but *the legal* obligation. The former, it is well settled, is a good consideration as a general rule, for an express pro-

Force v. Haines.

mise; the latter alone will raise an implied one. Without referring to the numerous cases to be found in the books, I shall ground my opinion upon general principles extracted from them; referring to specific cases only for the purpose of better illustrating my meaning.

This case stands entirely clear of those authorities which hold the master liable for necessaries found his servant or slave, on an emergency; as on a sudden injury or hurt on the highway or elsewhere, or a distance from home, and where the master is not accessible. These cases constitute a class of themselves, and the rule of law which applies to them, and the reason of that rule, has no application to the present question. Here, there was no immediate necessity, but a long continued support of the black woman by Mrs. Haines, for which she was no more liable, either legally or morally, directly or indirectly, than any other citizen. She cannot answer that the support was not voluntary, inasmuch as she could not turn the slave out of doors, without outraging the benevolent and kindly feelings of her nature. The principle of law does not depend upon matter so loose, and indeterminate as this. To show the support was not voluntary on her part, Mrs. Haines should make out that some *obligation* to render, it, rested upon her *specially;* not merely that she was in a situation which called into exercise, her kind feelings. Benevolent acts, which are the legitimate offspring of those feelings, are never the subject of legal enforcement. I repeat therefore, that in the most extended sense, it was a voluntary support, for which no recovery can be had. No one can assume another's burthens, without his assent, and then charge him with the cost. To make a defendant liable in such a case, there must either be a *previous request* or *subsequent express promise.*

II. But it is contended that this principle is subject to certain limitations; and that if the service be performed *with the knowledge* of the defendant (as in the present instance) he is liable.— As where a physician attends a servant or slave in the family of his master, and in like cases, it has been held that he could recover, without further proof. But these cases do not depend upon the fact that the master had knowledge of the service merely, but upon the more important fact, that the service was rendered under such circumstances as unavoidably carry with them

the inference that it was done with the master's *approbation and consent*. If the master could prove otherwise—if he could show that he had actually forbid the attendance of the physician, it would rebut the prima facie presumption arising from the circumstances, and repel effectually any inference of a promise to pay. In law and in reason, we are only authorized to *infer* facts in the absence of express proof. In the present case, it is proved affirmatively, that at least six years before the commencement of the suit, Mrs. Haines was expressly told by Force, that he would never again receive the slave, and if she should recover any thing of him, sooner than pay it, he would put his property out of his hands. In the face of this evidence, how was it possible for a court or jury to *infer*, as matter of fact, a promise upon the part of Force to pay for the slave's support? Such an inference does appear to me, with very great respect to the opinions of others, to be directly at variance with the manifest understanding of the parties, and in open contradiction of the facts proved on the trial. Mrs. Haines has the less ground of rightful complaint against Force, inasmuch as before the support now in controversy was rendered, he in the language of the day, " distinctly defined his position," by an assurance that he would never pay her a cent.

But this very refusal of Force to support the slave, is made the ground work of the plaintiff's alleged right to recover. It is admitted, that had the services been rendered without first apprising Force of the circumstances, he being accessible, they would have been held a voluntary courtesy merely—no inference could have been drawn therefrom of a promise to pay. But Force having refused to perform a legal duty, after notice, it is contended that the jury were authorized to *infer* a promise on his part to pay Mrs. Haines who performed it for him.

Now disguise this position as you may, when applied to the facts of this case, it amounts to this: If Mrs. Haines had never applied to Force, and he had neither known " nor said any thing about it, a jury could *not* then have inferred a promise to pay; but having applied to Force, and he having positively refused to pay, *ergo*, the jury could infer a promise to pay! If this were a *legal* implication from the premises: an arbitrary conclusion of law arising out of his refusal to support his slave, and to be applied to the facts, by the *court*, it would be less absurd; but

unfortunately for the argument, that is not even pretended.—
Whether or not the circumstances will justify the inference, that
the defendant did in point of fact, promise or intend to pay, is
an admitted question of fact for the jury, not a legal principle to
be applied by the court. As in *Oatfield* v. *Waring*, 14 *J. R.* 188,
one of the strongest cases cited by the plaintiff's counsel. It was
an action like this, to recover of the master, pay for the support
of his slave; and the court in the meagre opinion delivered, held
that whether a promise to pay was inferable against the master
from the facts proved, was a question rightly put to the jury.

This distinction between facts and inference to be found by the
jury, and legal principles to be applied by the court, it is impor-
tant to keep in mind. But can the abstract principle be correct,
that where the law imposes a duty which a defendant refuses to
perform, he can be held liable to any third person who performs
it for him, even against his assent? I think not; and yet this is
the broad position to be sustained. Every taxable citizen is re-
quired by law, to work on the highway or pay an equivalent—to
attend militia muster, or pay his fine—to pay his annual, county
and state taxes; and in fine to do many other matters under com-
pulsory provisions of the statute book. If he refuse after due
notice, can it be that another may assume his burthen, against
his assent, and hold him liable? And yet such must be the result
of this rule if once established. But I apprehend that no class
of cases to be found in the books, is properly referable to such a
principle. My attention having been called by one of my brethren,
to "Smith's selection of leading cases," a late English publica-
tion to be found in the Law Library, I extract the following
position from a note to *Lampleigh* v. *Brathwait*, page 67, Janu-
ary No. A. D. 1838. To sustain an action, a request may be
either *express* or *implied.* If it have not been made in express
terms, it will be implied under the following circumstances:

1st, Where the consideration consists in the plaintiff's having
been compelled to do that to which the defendant was legally
compellable. *Jeffries* v. *Gurr*, 2 *B. & Ad.* 833 ; *Pownall* v. *Fer-
rand*, 6 *B. & C.* 439 ; *Exall* v. *Partridge*, 8 *T. R.* 308 ; *Tous-
saint* v. *Martinnant*, 2 *T. R.* 100.

2d, Where the defendant has adopted and enjoyed the benefit
of the consideration &c.

3d, Where the plaintiff *voluntarily* does that whereunto the defendant was legally compellable, *and* the·defendant afterwards in consideration thereof, *expressly* promises. *Wennall* v. *Adney*, 3 *Bos. & P.* 250, *in notes; Ming* v. *Mill*, 1 *B. and A.* 104; *S. N. P.* 8 *ed. p.* 57, *n.* 11; *Paynter* v. *Williams*, 1 *C. and M.* 818.

4th, In certain cases where the plaintiff *voluntarily* does that to which the defendant is *morally*, though not *legally* compellable, and the defendant afterwards, in consideration thereof, *expressly* promises. 5 *Taunt.* 36; *B. N. P.* 129, 147, 281; *Cowp.* 544; 2 *East*, 505.

These are the several classes of cases where after a consideration is executed, a request may be implied, but in the last two, which embrace the case now under consideration, there must be an *express promise*, or no action can be sustained. In the present case, the utmost contended for, is that the jury, (not the law,) was authorized to *imply* a promise. But there is no class to which such a case could be referred. Under the first head, some cases have gone very far; as where a tenant has satisfied some legal demand against his landlord, and has been held entitled to recover. But in all these cases, it would be found, that either the tenant or his goods were in some way liable to the demand; as by distress or otherwise; and in such cases, it has been held that a tenant need not wait till he be distrained upon, but if he pay upon a threat or demand, it will be held compulsory. 4 *T. R.* 511; 6 *Taunt.* 524; 5 *Bing.* 406; 8 *T. R.* 308; 5 *B. and A.* 521; 11 *East*, 53, and the *law*, not the jury, will imply a promise upon the part of the landlord to repay him.

But I apprehend that the case now before us, was decided in this court, in *Potter* v. *Potter et al.* 2 *Pen. R.* 415. There is no distinction between the two. In that case, the plaintiff demanded $100 for keeping an old infirm black woman, the property of the defendants, for six years; when according to law &c., the defendants' were bound to support and maintain her, but which, *upon demand, they refused to do, etc.* The very case now before us. This court then held that the plaintiff could not recover, as the demand did not show a request &c., and it is added, the court "were clearly of opinion that the plaintiff below could not take upon herself to maintain the slave, and then bring an action for

such maintenance." And this, be it remembered, was a case too, where the defendants had refused to support her, after notice.

I hold therefore, that the refusal of the defendant to supply his slave Minna, did not raise an implied promise in law, in favor of Mrs. Haines. And the positive refusal to pay, expressly proved by the plaintiff herself, left not the slightest ground for the jury to infer a promise in fact.

III. There was still another ground assumed on the argument, which at the time, appeared to me more plausible than either of the preceding, but I think equally unsound. The liability of the master to support his slave, was likened to that of a husband to support his wife, or a parent, his child; for whose necessary maintenance, he is liable under certain circumstances, though rendered against his express orders. But these cases I apprehend have always stood upon their own foot; regulated not by general principles, but such rather as have their origin in the legal character and relationship subsisting between the parties. They constitute rather an exception to general principles, than a rule.

It was assumed on the argument, that the principle had been extended to apprentices; and there certainly are some Nisi Prius cases that way; but the authority of those cases to say the least of them, is not well settled. Vid. contra, *Winnall* v. *Adney*, 3 *Bos. and P.* 246; *Newby* v. *Wiltshire*, 2 *Esp. N. P. C.* 739; *Percival and Johnson* v. *Nevill*, 1 *Nott and McCord's R.* 453; Nor do those elementary writers who treat upon domestic relations, (so far as I have been able to consult them,) mention or allude in any way to the existence of such a principle as applicable to apprentices. Still, it is not necessary to decide this point, or even intimate an opinion thereon; for though some cases may extend the principle to apprentices, towards whom the master is *in loco parentis*, it by no means follows that it ought to be extended to slaves. That it never has been so extended, is most manifest from an examination of the cases: many of which, must have been decided directly the reverse of the actual decisions, if the liability of the master for his slave's support, were regulated by the same rule that governs the liability of husband for wife, and parent for child. Apply this rule to the case of *Potter* v. *Potter et al.* above alluded to, and beyond a doubt the court would upon the facts, have held the defendants liable. So in the case

of *Dunbar* v. *Williams*, 10 *J. R.* 249, where a physician without the knowledge of the master, had cured a slave of a foul disorder, (which the slave concealed from his master) the court held that as the services rendered, were not *in extremis*, and he had not cared to get the assent of the master, he could not recover. Had the same service been rendered a wife, under like circumstances, the *law* would have implied an assent upon the part of the husband, and compelled him to satisfy the demand—1 *Ld. Raym.* 444 5; 1 *Sid.* 127; 3 *B. and C.* 635; 1 *Camp.* 121; 1 *Salk.* 116; 2 *Ld. Raym.* 1006; 2 *Kent. C.* 146; 5 *Bos. and P.* 148; 8 *T. R.* 72. This shows a clear distinction between the cases. The liability of the husband for necessaries for his wife, depends solely upon an assumption in *law*, that she is his *general agent* in regard to them. Such is the uniform language of the books. The liability of the parent for his child, depends, in the language of the books, upon the *natural* obligation which he is under to furnish necessaries for his infant children. *Van Valkenburgh* v. *Watson*, 13 *J. R.* 480. Neither bears the most remote analogy to thé liability of a master for the maintenance of a slave. The former 'are bone of our bone and flesh of our flesh.' The latter, in the eye of the law, is for most purposes an article of property alone. The legal principles applicable to them, are in reference to their respective positions. Where a husband sends his wife into the world, he is liable for her necessaries, " and sends credit with her to that extent "—and the same may be said of his child. It would be against public policy to require them to apply for public relief on the ground of pauperism, preparatory to charging the husband or parent. It would in most cases, in effect exempt the husband or parent from all responsibility. Though he may be of large means, yet the wife or child may be surrounded by associations and connections, which would induce them to go unaided through life, rather than submit to the degradation of holding themselves out to the world as public paupers. Public policy forbids it—a proper respect for the relationship and reciprocal duties of husband and wife—parent and child, forbids it. But the same reasons do not extend to slaves.

If they be left destitute, let application be made to that source provided by law, and relief may be had; and that too at the ex-

pense of the master. It is true that the statute *Rev. L.* 375, *Sec.* 26, provides that the owner of a slave, who is unable to support himself, shall be obliged at all times to support him, except where the owner himself becomes insolvent, &c. but this is not intended to interfere with the general right and duty of overseers of the poor to grant relief, until such time as it shall be in their power to oblige the owner to do his duty. When the act says the owner "shall be obliged at all times to support and maintain such slave," upon whom did it intend to cast the burden of enforcing that obligation? Surely the slave was not to be left to the chance charities of the world—to the uncertain benevolence of individuals, until some person from the pure love of justice should take it upon himself to *oblige* the owner to support his slave.— No, the law intended no such absurdity. The same objection was taken in the case of *The Overseers, etc. of S. Brunswick* v. *The Overseers, etc. of E. Windsor*, 3 *Hal. R.* 64; but Ch. J. Ewing, said "every person unable to provide for and maintain himself, is *prima facie*, a pauper entitled to relief," and the township where he is, must provide for him, till his disability is removed, &c., and in case of a slave, must seek out his owner, &c.

If any possible doubt could exist about this, the above opinion I apprehend would settle it. I repeat, therefore, if a slave be left destitute, let the public officer apply the remedy, and look over to the owner. I am unwilling to sanction the principle contended for in this case—a principle which will justify a slave in calling in medical aid against the consent of the master, and when perhaps the master would not have called in such aid, for one of his own family. It is no answer to say that the physician before he can recover, must prove that *his* attendance was necessary; that the medical attendant employed by the master for his own family, was a quack, wholly unfit for the exigencies of his slave's case. The master is not to be burthened with a law-suit in that way, by the interference of *individuals*. If he really fails to provide properly for his slave, let the public officer who acts under the responsibility of official duties, right the wrong. If individuals interfere without the master's assent, he being accessible, and the services be not rendered *in extremis*, they are gratuitous, and no recovery can be had. Such is the general language of the cases, and such I doubt not is the law.

I cannot depart from it. There is nothing tends so much to destroy and unsettle its principles, as an effort in courts, (however well meaning) to mould and modify them, to meet the fancied hardships of a given case. I am unwilling to do so here, and think that the judgment below should be reversed.

HORNBLOWER, C. J. This cause comes before us, upon a writ of error : it makes no appeal to our discretion or our sympathies —it presents for our consideration, an abstract question of law : we are not called upon to say, whether the jury did right or wrong ; but simply, whether upon the pleadings and evidence in the cause, the plaintiff below was entitled to recover at all. With this postulate in view, let us inquire what are the facts of the case, not as *we* read them on the bill of exceptions, but as we must *intend* the jury found them to be ; for we must take the case as to facts, as strong against the defendant below, as the jury had a right to find them from the evidence in the cause. We may proceed then upon the ground, that on the 19th June, 1826, the day on which Mrs. Haines was bound to deliver up the slave to Force, she conveyed her to his house, and requested time to receive her ; she then being blind and helpless, without any fault on the part of Mrs. Haines : that Force, instead of receiving and providing for the slave, as he ought to have done, absolutely refused to receive her into his house, so that Mrs. Haines was obliged to leave her in the street, or to take her back to her own house : that Mrs. Haines took her home and kept her until the Spring of 1830, when she (Mrs. Haines) called on Force, complained of his conduct, and urged him to take Minna (the slave) off of her hands : that he refused to do so, declaring he never would receive her, unless compelled to do so by law ; and that if Mrs. Haines recovered any thing against him, for taking care of her, he would put his property out of his hands ; that afterwards and before the commencement of this suit, Mrs. Haines sent Minna, by her son and the witness, Mr. Whitehead, to the defendant's house, and left her there ; but that he immediately sent her back to the plaintiff's, where she remained and was provided for from that time to the commencement of this action.

Upon a careful examination of the evidence contained in the bill of exceptions, I am of opinion, the jury were fully warrant-

ed in finding the facts to be, as I have stated them, and I therefore assume them to have been so.

The question then arises whether upon these facts, Mrs. Haines, was entitled to recover in this action, *any thing*, for the board and maintenance of the slave, for *any portion* of the time she remained at her house ? That she was so, after the most careful consideration of the whole matter, I have not the least doubt.

Not only, by the law of our nature, but by the positive enactments of our statute, every master is bound to provide for, and support his slave. If the slave is aged and infirm, a cripple, or blind, or otherwise diseased, the master, unless himself a pauper or insolvent, must take care of and provide for such slave. The slave, if hungry, must be fed : if sick, must be ministered unto : if blind, must not he turned out of doors, to perish by the way side. The law has not left it to the humanity, the avarice, or the caprice of the master, to say, whether he will or will not, support his helpless slave ; nor yet, whether he will do it himself, or compel the public in the first instance to furnish such support, and then look to him for remuneration.

It is not matter of consent, or promise, or contract, on the part of the master, that makes him liable : imperious duty imposes the obligation upon him, and righteous law *makes him willing* to perform it. The law presumes every man is willing to obey its mandates; and proceeding on that presumption, it implies, (even against his will,) his consent, or request or promise, in order to enforce the remedy ; when by the forms of law, the existence of such consent, request or promise, is necessary to support the action. That such is the principle of law, in the case of husband and wife, and of parent and child, will not be denied : and why it should not be so, in the case of master and slave, I cannot conceive, unless we are to degrade the slave to the condition of a brute, and deny to him those sympathies, which the law recognizes in relation to human beings. But, without pursuing these remarks further at present, let me ask ; what, if the owner of a blind and helpless negro woman, suffering at the moment, with hunger and nakedness, should thrust her into my doors, telling me, with brutal insult, at the same time, that if I relieved her sufferings, or administered to her necessities, he would never

pay me: would I, in such case, be reduced to the alternative of choosing whether in violation of every feeling of my nature, and of every dictate of humanity, I will turn her out of doors, blind, hungry and naked, as she may be, to perish like a brute, or whether at my own expense, however illy I can afford it, I will give her necessary food and raiment, and a shelter from the storm, until she can be otherwise provided for? And yet, unless I greatly misunderstand the arguments of my brethren, I should, under the circumstances I have mentioned, be reduced to just that dilemma. I know the answer to this is, that I ought to make application to the overseers of the poor. But what right has the master of a slave, by leaving her at my house, against my will, to cast that burthen upon me? Does he not thereby subject me to trouble, for which the law will imply on his part, a promise to remunerate me? And why, under such circumstances, may I not relieve her myself, and look to him for remuneration? While, in words, he refuses me compensation, in conduct, he imposes a burden upon me, and thereby in legal effect, promises to make compensation. Admitting however, for the sake of argument, (for I am not prepared to admit it as a legal proposition) that the overseer would be bound to come and provide for the slave; he may reside at a distance; time must be taken; days may elapse, before the machinery of pauper relief, can be set in motion; or the overseer, not thinking himself bound to interfere, or for other reasons, may neglect or refuse, to afford relief: in the mean time the slave is suffering; food must be furnished, and shelter provided: at whose expense, is this to be done? If not at the expense of the master, then indeed is the case of a slave, an anomaly in our law; and a diseased and worn out slave, no better off, and has no more claims upon our humanity, or the protection of our laws, than a beast of burthen. A master may turn his blind slave, as he would his old horse, into the street, and he who administers to the relief of either, must do it at his own expense.

But again: suppose upon the application of Mrs. Haines, the overseers of the poor had received the slave, and afforded her relief; at whose expense must it have been done? Surely not at the expense of the township; but how then could the overseers have been re-imbursed? I know of no way, but by an action against the master, for money paid &c. There is no such thing in the

law, as an order of Sessions, on a master, for the maintenance of his slave. But how could the overseers of the poor maintain such action, upon the *implied* request of the defendant, against his positive refusal to pay, any more than Mrs. Haines could? I know of no statute giving them such action; nor any principle of the common law enabling them to recover upon an implied assumpsit, when for the like services and precisely under the same circumstances, any other person could not equally recover. The argument, if I understand it, is, that in the case of *Master and Slave*, the law, will imply no request, or promise to pay for necessaries furnished the slave, if the master expressly refuses to make such provision himself. But the moment it is conceded, that the overseers of the poor might maintain such action, the argument is given up; unless some statute, or rule of law, can be shown giving them such action. If the overseers, in the absence of any such statute or rule, can recover against the master, it must be, because he *neglects or refuses* to discharge a *legal* and imperative duty: and for the same reason, I maintain, that any other person, placed, by the act of the master, in such circumstances, as Mrs. Haines was, in regard to this slave, can equally maintain the action.

But after all, I deny that the overseers were under any legal obligation to interfere: they would have been volunteers if they had done so, and have stood in no better position towards Mr. Force, than Mrs. Haines did.

I admit, that as well in this state, as in England, township or parish officers are bound to relieve, the *casual poor ;* and that, (at least so far as I can discover,) not by force of any special enactment, but upon general principles of public policy and humanity. But it is a mistake to suppose that this slave came under the description of *casual poor.* Casual poor, are such poor persons as are suddenly taken sick, or meet with some accident, when from home: and are thus providentially thrown upon the charities of those among whom they happen to be ; and when in such cases, the parish officers, afford relief, they have no remedy over for the money expended, not even against the parish, where the person relieved, was regularly chargeable. It was so decided expressly in *Atkins et al.* v. *Banwell et al.*, 2 *East,* 505. Le Blanc, justice, in that case said, " there was a moral as well

as a legal obligation, to maintain the pauper in his illness, in the parish where he was at the time," and therefore that parish could not recover the money expended in relieving the pauper. In *Simmons* v. *Wilmott*, 3 *Esp. N. P.* 94, it was held that Parish officers were bound to provide for *casual poor ;* and being under a legal obligation to do so, if the plaintiff not being such an officer, furnish the necessary relief, he may recover against the Parish officers, the money expended in providing for the pauper. So in *Wennall* v. *Adney*, 3 *B. & P.* 274, the defendant's (hired) servant, while driving his team, fell from the wagon and broke his arm : the plaintiff a surgeon, was called in, and attended him ; and brought this action against the master, to recover for his services : but he was nonsuited on the trial, and the court refused to set aside the nonsuit. Lord Alvanley said, "he had no doubt, but the parish officers, were bound to assist, where such accidents take place : *and that the law would so far raise an implied promise against them*, as to enable a person affording that immediate assistance the necessity of the case required, to recover against them, the amount expended." And again, in *Newby* v. *Wiltshire;* 2 *Esp. N. P.* 739, a servant boy fell from his master's wagon, and broke his leg : the overseers of the parish provided for him, and expended thirty-two pounds. This action was brought by the overseers, against the master, to recover back the money. Lord Mansfield and all the judges, held that the action would not lie: that the parish was bound to take care of accidents ; and that though in general, masters ought to take care of their servants in sickness, they were not legally bound to do so ; and see *Lamb* v. *Bunce*, 4 *M. and S.* 275 ; *S. C.* 6 *Petersd. Abr.* 186. These and other cases that might be cited, fully establish the following positions :—1st, That parish officers, are bound to provide for *casual poor.*—2dly, That they cannot at the common law, recover back the money expended, in relieving such casual poor, because such poor are chargeable to the parish where they happen to be at the time they are taken sick :—and 3dly, That the parish officers, being, not only under a moral, but positively *legal obligation*, to furnish such relief, the law, will raise an *implied promise* against *them*, in favor of *any person* affording the relief required by the urgency of the case, and which they neglected or refused to provide, or had not time to furnish.

The application of these principles to the case before us, it seems to me, must be decisive. In the first place, this slave could not be considered, as a *casual pauper*. This I presume, is a result, not intended to be reached. In the second place, if the overseers of the poor, are under a legal obligation, to provide for the casual poor, much more is a master under a legal obligation to provide for his helpless and dependent slave ; and thirdly, if a stranger affording necessary relief to a *casual pauper*, may maintain an implied assumpsit against the parish, upon the ground of its *legal* obligation to provide for such pauper, much more, may a person upon whose hands a master has thrown his helpless slave, maintain against him, a similar action for necessaries furnished such slave.

No argument can be drawn from the terms, immediate relief ; urgent necessity, &c.: for just as long as Force left his slave with Mrs. Haines, unprovided for by him, it was a case of urgent necessity. The wants of the slave were new and pressing every day and hour. She was constantly, *in extremis*, and required constant care. If the overseers of the poor, were not bound to interfere, and I think I have shown that they were not ; I earnestly ask, what was to be done ? If Mrs. Haines had no right to supply her with the necessaries of life, at the expense of the master, nobody else had : she must then, have been continually sustained by the hand of private charity, or turned out of doors, to perish with hunger. Can the laws of New Jersey require such an alternative ? I think not. It is conceded, that if a man turns his wife, or his child out of doors, he sends his credit with them, for a support, equal at least, to his circumstances in life ; and why not, when he shuts his door, upon a poor blind slave, send along with her, his credit, at least so far, as to keep her from starving ? To suppose that the law, out of regard to the delicate feelings, or the family pride of wives and children, will make provision for them, while it leaves the unhappy and degraded slave to the cold charities of the world, is to cast upon it, a reproach which it does not deserve.

No case, it is true, directly in point, can be found in the English books, because in England they have no such relation as master and slave. But we find there, those broad and salutary principles of the common law, which have their foundations in

the rules of eternal justice, and which will not only compel a man to perform his express promise, when made upon a good consideration, but which will *imply* a promise on his part to do that which in justice and equity he ought to do, and which as a man and a citizen he is, *by law,* bound to do. Hence it is, that an action lies against a man for necessaries furnished his wife or child, or for money expended in burying their dead bodies; as in *Jenkins* v. *Tucker,* 1 *H. Bl. R.* 90 ; and that too, not only in the absence of any request by him, but when done in direct opposition to his will : and the reason is, that the law has not left it to his choice, whether he will support his wife and child, or not. If it did, nothing short of his actual agreement could bind him for their support. But the law imperiously requires him to do so ; his liability therefore, is a *legal,* not a *conventional* liability, and the law enforces that duty, by implying his request and promise. The case of Master and Slave, under the laws of our state, is perfectly analogous to the case of husband and wife, at the common law. Ingenuity itself cannot distinguish between them. Nothing it seems to me, but a morbid insensibility to the claims of the slave for the sympathy and protection of the laws, can imagine any difference.

Cases have been cited, which are supposed to stand in the way of this action ; but in my opinion those cases have no such bearing. As to those cases, in England, in which the liability of a master to pay for medical or surgical aid furnished to his servant, has been discussed or denied, they have no application to the question now before us. The relation of master and servant in England, is entirely different from that of master and slave in this country. I need not stop, to point out the difference.

The case of *Potter* v. *Potter, Penn. R.* 415, decides nothing more, than that the plaintiff could not take upon herself to maintain the slave, and then recover for such maintenance. She was a mere volunteer, and there was no evidence of any delinquency on the part of the defendants, or any necessity cast upon the plaintiff to provide for the slave.

The case of *Dunbar* v. *Williams,* 10 *Johns. R.* 249, so far from militating against this action, in my opinion, sustains it.— The plaintiff, a physician, administered to a slave of the defendant, for a secret disease, without being requested by the defend-

ant to do so.   The Supreme Court said, " if medical aid or assistance be rendered to a slave, in a case of necessity," the master would *probably*, be bound to pay.   " The law would raise an implied assumpsit, on the ground that the master was legally bound to provide for his slave."  " But in this instance, the slave did not require instant and indispensable assistance : we are to presume the master was accessible, and both willing and able to provide for his slave &c."   The service was voluntary ; it was not a case *in extremis ;* and if the plaintiff did not choose to apply to the master, his service must be deemed gratuitous.   As to the case of *Bartholomew* v. *Jackson*, 20 *John's. R.* 28, it only shows, what is not disputed, that a mere gratuity, constitutes no ground of action.   The plaintiff kindly, but unasked by the defendant, removed a stack of wheat belonging to the defendant, to prevent it being burned ; and then sued the defendant for his services.   The defendant was under no legal obligation to remove his wheat; he might suffer it to be burned up, if he thought proper to do so, and the plaintiff had no right to impose upon him the expense of removing it.

On the other hand, " there are many cases," as Lord Loughborough said, in *Jenkins* v. *Tucker*, 1 *H. Bl. R.* 90, " in which if a person pays money, which another is under *a legal obligation* to pay, though without his knowledge or request, he may recover it back, in an action of assumpsit ;" and he instances the payment of taxes by a neighbor, to redeem goods distrained for them, by the tax commissioners.   And in *Oatfield* v. *Waring*, 14 *John's R.* 185, there was no pretence of an actual request, but the contrary, the owner of the slave had prosecuted the plaintiff for the penalty given by law, for harboring his slave ; but had failed in that suit, on the ground that the owner had permitted the slave to live with the plaintiff and had never directed him to be sent home : yet the plaintiff recovered against the owner of the slave, for his board and maintenance : and the Supreme Court of New York said, a request, might be inferred from the beneficial nature of the consideration, and the circumstances of the transaction, and that it was the province of the jury to determine from the evidence, whether a request could be inferred or not.   I would only add, that in the case now before us, it was manifest that Force had in contemplation, his liability to *respond*

to Mrs. Haines, for the maintenance of his slave; for he told her if she recovered any thing against him, he would put his property out of his hands; and in my opinion a man cannot excuse himself from paying, what by law he is bound to pay, by simply refusing to do so.

For the reasons I have assigned, I am decidedly and strongly of opinion, that the judgment in this case ought to be affirmed.

NEVIUS, J.    This is an action of assumpsit brought by the defendant in error, to recover from the plaintiff in error, a sum of money for the support and maintenance of a negro girl alleged to be the slave of the plaintiff.

The declaration contains two counts—

The 1st charges, substantially, that the defendant below, on the 2d of September, 1822, by deed of bargain and sale, in consideration of $60, sold to the plaintiff, the service of a black girl aged 29 years and 3 months, till she should arrive at the age of 33 years, or till the 19th of June, 1826, on condition that at the expiration of that time she should be delivered up to the defendant, and avers that she was the defendant's slave, and he bound to provide her support from the expiration of that time of service, and that the plaintiff was ready and willing and offered to deliver said slave to the defendant, according to the condition in said bill of sale, and that he refused to receive her.    That on the 1st day of April, 1836, in consideration that the plaintiff had provided said girl a support from the 19th of June, 1826, till the day last mentioned, the defendant promised to pay her so much money as she deserved to have, which she avers to be $2000.

The 2d count, charges the defendant with being indebted in the sum of $2000, for meat, drink, &c. found and provided by the plaintiff, at his special instance and request, for said slave, and in consideration thereof he undertook and promised to pay, &c.

To this declaration, the defendant pleaded the general issue, and the statute of limitations.

From the state of the case agreed upon by the parties, it appears that upon the trial, the plaintiff proved that the girl for whose support the action was brought, was the slave of the defendant, that he had sold her to the plaintiff for the time specifi-

ed in the declaration, and before the expiration of that time, she became blind and unable to earn a support. That at the expiration of that time, the plaintiff took her in a gig with the view, as she said, of returning her to the defendant, and was gone long enough to have done so, but on her return, brought the girl with her. That she remained with the plaintiff, till May or June 1828, when the plaintiff told her she could keep her no longer, whereupon she went to a Mr. Morse's where she continued till December or January following, when Mr. Morse sent her back to the plaintiff's, where she has been ever since. That about seven or eight years before the trial, she was taken to the defendant's and left there, but by some means returned again shortly to the plaintiff's.

That in the Spring of 1830, the plaintiff went to see defendant, and requested him to take the girl, complained that he did not treat her right in refusing to receive her, and that he replied he never would receive her unless obligated by law, and if the plaintiff recovered any thing of him, he would put his property out of his hands. That since the expiration of her term of service, she has been chargeable, and her support worth twelve or fourteen shillings a week.

Upon this evidence, the court refused to non-suit the plaintiff on the motion of the defendant's counsel, and the cause having been submitted to the jury, under a charge from the court, that they were judges of the law as well as the facts, and that the statute of limitations was a bar to any claim beyond six years next before the commencement of the suit, a verdict was rendered for the plaintiff for the sum of 300 dollars. Upon which, judgment was given.

To reverse this judgment, the present writ has been brought, and the following errors assigned :

1st. That the declaration is not sufficient in law for the plaintiff to maintain her action.

2d. That the court below admitted illegal and rejected legal evidence.

3d. That the plaintiff on the trial, failed to prove any promise by the defendant to pay her for the support of the slave, or any request by him that she would furnish such support.

4th. That the court below, refused to non-suit the plaintiff for such defect of proof.

5th. That there was error in the charge of the court.

Upon the 1st error assigned, it is urged that the first count in the declaration is defective, inasmuch as it contains no allegation that the support provided by the plaintiff for the slave, was provided at the instance and request of the defendant. Whatever force there might be in this objection, on a special demurrer, it is cured by the verdict, for the want of a proper averment in a declaration will after verdict, be intended to have been supplied by proof. 1 *Chitty,* 401; 1*st. J. R.* 276. But the second count not being liable to such objection, and entire damages having been given, without application to the court, by the defendant, to instruct the jury to disregard the first count, the verdict should not for that reason be set aside. *El. Dig.* 296, *Sec.* 21.

The second error assigned is not sustained by anything found in the bill of exceptions or state of the case.

The only important question involved in this case is raised by the third error assigned, viz: That the plaintiff failed to prove either a promise by the defendant to pay for the support of the slave, or any request by him that the plaintiff would furnish such support. It is certainly a general and a sound rule that such request or promise must be proved, to entitle a party to recover for services rendered, for no recovery can be had for a mere voluntary courtesy. But as the law will imply a promise to pay, from a previous request, so it will imply a request on proof of certain circumstances, and the beneficial nature of the services rendered. 1 *Saund. R.* 264, *note;* 14*th J. R.* 188.

Let us briefly examine, therefore, what legal obligation the laws of New Jersey impose upon a master, touching the support of his slave; and what was the nature of the services rendered by the plaintiff, and under what circumstances, as proved on the trial.

By the 26th section of the act respecting slaves, *El. Dig.* 525, every owner of a slave is obliged to support and maintain such slave, unless he be insolvent and unable to do so, then such slave unable to support himself or herself, shall be deemed a pauper. No slave therefore can be a pauper, or have a settlement in New Jersey, whose master is of sufficient ability to support him. It is true that in cases of urgent necessity, when immediate relief is required, an overseer of the poor may contribute and I appre-

hend is bound to contribute such relief to a slave whose master can support him, and who is not a pauper, but this duty arises from the law of necessity and humanity, and not from any express provision in the statute. And in such case, the overseer could recover from the master, without either a request on the master's part, or a promise by him to pay for such relief. 3 *Hal. R.* 52. And the same law would govern in case any other individual as a surgeon, physician or apothecary should render the service in emergent cases. But where such immediate necessity does not exist, as no justice can by our laws make an order for the *support* of any other than paupers having a legal settlement in the township, the overseer is under no higher legal obligations to support such slave, than any other person. The plaintiff in this case, then, would be entitled to the same remedy against the master, that the overseer would be entitled to, in case he had found the support.

What then were the circumstances proved in support of this claim, on the trial. It was proved that the girl was a slave, that the defendant was her master and owner, that she was infirm and blind, unable to seek an asylum elsewhere; or support herself; that she became so whilst lawfully in the possession of the plaintiff, that the plaintiff did find her necessary support for a number of years before the commencement of this suit, that this was done with the knowledge of the defendant, and direct notice given to him, and repeated applications to him to take charge of said slave and maintain her ; that he refused to receive her, and declared if a recovery was had against him, he would evade the payment by putting his property out of his hands. Here was a legal obligation on the part of the defendant, to support this slave knowing that she needed such support, an appeal to him to provide it, repeated requests on the plaintiff's part to him, to take such slave and make the necessary provisions for her support. I can not say therefore, that the jury erred in finding that these circumstances amounted to a request on the part of the defendant, that the plaintiff would find such support. When he knew that she was at the plaintiff's house, and maintained at her charge, and was solicited to take her away and receive her, his refusal to do so, amounted at least to a *consent* that the plaintiff should support her, and the law will imply under these circumstances, a re-

quest notwithstanding his declaration that he would never pay for such support. I cannot think the jury erred in rendering the verdict they did upon this testimony. The service rendered by the plaintiff was not gratuitous and voluntary, but in a measure compulsory, and the defendant was fully advised of it, and I should deem it a stain upon our laws, if he could so easily evade his legal obligations.

In arriving at this conclusion, I am not aware that I come in conflict with any legal principle or authority cited by the defendant's counsel. The case most strongly relied upon, to wit, that of *Potter* v. *Potter, Penn.* 415, was decided on the state of demand which did not aver a request or promise to pay, and would have been applicable to this, had there been a demurrer to the first count of the declaration in this case. The case in 20*th John. R.* 28, was clearly a voluntary courtesy for which the plaintiff could have no legal demand. So also in the case 10*th J. R.* 249, the master had no notice of the service rendered his slave, by the physician—and the case of *Jenkins* v. *Tucker*, 1*st H. Blackstone*, 90, fully corroborates the doctrine I contend for;—not being able to find any other distinction between the liability of a husband and father, for the support of a wife or child, and that of a master under our laws for the support of his slave, than that a notice in the latter case should be proved, while in the former, the law infers it.

This view of the case, disposes also of the fourth error assigned.

The last error assigned, is, that the court misdirected the jury in charging that they were the judges of the law as well as the fact. But it must be recollected this charge was made at the defendant's instance, and he has no right to complain if the jury judged rightfully of the law, as I apprehend they did.

I am therefore of opinion, that judgment should be rendered for the defendant in error.

*Judgment reversed.*